IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN ARNDT,                         :          CIVIL ACTION
          Plaintiff,                 :
                                     :
     v.                              :
                                     :
JOHNSON & JOHNSON, et al.,           :          NO. 12-6633
          Defendants.                :

MEMORANDUM

PRATTER, J.                                              MARCH 5, 2014

After Defendants removed this action to federal court, Plaintiff Shawn Arndt moved to remand the case to the Philadelphia Court of Common Pleas. Defendants oppose the remand motion, arguing that Defendant McNEIL-PPC is a New Jersey citizen and that all other Defendants who supposedly present an impediment to removal were fraudulently joined. After considering the extensive briefing and oral argument, this Court will deny Mr. Arndt's motion.

BACKGROUND

On November 2, 2009, Shawn Arndt, a New York citizen, purchased a bottle of Infant's Tylenol at Tops Market and administered one dose to his 4-year-old son Joshua, who had a slight fever. Within minutes, Joshua started bleeding from the nose and mouth. Rushed to the hospital, tragically, Joshua was pronounced dead upon arrival.

On April 30, 2010, Defendant Johnson & Johnson announced a recall of defective lots of Infant's Tylenol and other children's medication, which covered the bottle purchased by Mr. Arndt. Johnson & Johnson and subsidiary McNEIL also shut down McNEIL's manufacturing facility at Fort Washington. Thereafter, during a Congressional investigation, it came to light that the Fort Washington plant, where various children's medications were manufactured, including Infant's Tylenol, had pervasive quality control problems for several years. Moreover,

1

with the help of Defendants Inmar, Carolina Logistics, and Carolina Supply Chain Services, McNEIL and Johnson & Johnson had planned and implemented a stealth recall of various children's medication.[1]  Mr. Arndt also alleges that several of the individual defendants had a hand in the decision-making that led to the contaminated products reaching store shelves. Allegations regarding these individuals will be discussed in more detail below.

On October 31, 2012, Mr. Arndt filed suit in the Philadelphia Court of Common Pleas, asserting 19 causes of action against 16 Defendants.  The claims include strict liability, negligence, consumer protection violations, recklessness, breach of express and implied warranties, civil conspiracy, and negligent infliction of emotional distress.  Defendants removed to this Court, and Mr. Arndt moved to remand the action to state court ostensibly for three reasons:  (1) McNEIL has its principal place of business in Pennsylvania, and therefore removal violated the forum defendant rule; (2) Individual Defendants William Weldon (former Chairman and CEO of Johnson & Johnson), Ashley McEvoy (former President of McNEIL Consumer Healthcare Division), Edwin Kuffner (Senior Medical Director at McNEIL), Lorraine Bailer (Supply Chain Director at McNEIL), Rosemary Crane (former Johnson & Johnson Group Chairman of over-the-counter nutritionals), and Gary Benedict (Vice President of Sales at McNEIL) are Pennsylvania citizens, again making removal improper under the forum defendant rule; and (3) the Tops Defendants (Tops Markets LLC and Tops Holding Company), citizens of

---

[1]    These "stealth" or "phantom" recalls allegedly involved Defendants Inmar, Carolina Logistics, and Carolina Supply Chain Services going to retailers and purchasing all the targeted medications in stock.  Plaintiffs' allegations regarding the phantom/stealth recalls are ambiguous—they could be interpreted as alleging that executives at Johnson & Johnson and/or McNEIL simply planned recalls, that they actually implemented recalls of some unspecified products and did "market assessments" of others, or that they implemented stealth recalls of all of the children's products discussed in the Complaint. *See, e.g.,* Compl. ¶¶ 5, 86, 90, 95, 96, 100, 101.  In their opposition papers, Defendants argue that only unrelated products were subject to actual phantom recalls, and that Mr. Arndt has attempted to artfully plead around that fact.  As discussed below, the phantom recalls, even if sufficiently alleged, ultimately do not permit Plaintiff to prevail on his motion to remand.

New York, are not diverse.  Defendants argue that the Tops Defendants and Individual Defendants were fraudulently joined, and that McNEIL's principal place of business is in New Jersey.  Thus, Defendants contend that complete diversity of citizenship exists, and the forum defendant rule was not violated by removal.

Shortly after the motion to remand was filed and briefed here, Judge Mary McLaughlin of this District denied a motion to remand in a similar case involving Children's Tylenol pending in this District in which the plaintiff was represented by the same counsel as represents Mr. Arndt here.  *Moore v. Johnson & Johnson*, 907 F. Supp. 2d 646 (E.D. Pa. 2012) (McLaughlin, J.), *reconsideration denied at* No. 12-490, 2013 WL 5298573 (E.D. Pa. Sept. 18, 2013).[2]  When the plaintiff *Moore* filed a motion for reconsideration, primarily directed at the McNEIL citizenship issue, Judge McLaughlin scheduled an evidentiary hearing on the issue of McNEIL's principal place of business.  Mr. Arndt's case was held in suspense status pending the outcome of the *Moore* motion for reconsideration.  Ultimately, Judge McLaughlin denied the motion and retained jurisdiction of *Moore*.  *See Moore II*, 2013 WL 5298573.[3]  This Court then removed the *Arndt* case from suspense.  The Court invited supplemental briefing here regarding the impact of *Moore* on these proceedings and held oral argument on December 20, 2013.  Following oral argument, the Court again invited the parties to file additional supplemental briefing.  The matter is now ripe for decision.

---

[2]     The initial decision in *Moore* will be referred to as *Moore I*, and the decision on reconsideration will be referred to as *Moore II*; the decisions will be collectively referred to as *Moore*.

[3]     In a case with a complaint almost identical to the one here, Judge Robert Kelly recently followed the *Moore* decision and denied a motion to remand.  *See Sherfey v. Johnson & Johnson*, No. 12-4162, 2014 U.S. Dist. LEXIS 10690 (E.D. Pa. Jan. 29, 2014).  In another case pending in this district before Judge Paul Diamond, the court followed *Moore I* and denied remand without opinion.  *See Brown v. Johnson & Johnson*, No. 12-4929, Docket No. 36 (E.D. Pa. Feb. 8, 2013).  Judge Diamond also denied without prejudice a motion to remand in another similar action, inviting the plaintiff there to refile the motion after Judge McLaughlin decided *Moore* – an invitation that plaintiff apparently has thus far declined.  *See Epperson v. Johnson & Johnson*, No. 12-1533, Docket No. 14 (E.D. Pa. Oct. 12, 2012).

LEGAL STANDARD

Under 28 U.S.C. § 1441:

Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C.A. § 1441(a). However, "[t]he removal statutes 'are to be strictly construed against removal and all doubts should be resolved in favor of remand.'" *Boyer v. Snap-on Tools Corp.,* 913 F.2d 108, 111 (3d Cir. 1990) (quoting *Steel Valley Auth. v. Union Switch & Signal Div.,* 809 F.2d 1006, 1010 (3d Cir. 1987)) (additional citations omitted).

Removal must take place "within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based," or "if the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b), (c)(3).

All defendants in an action must timely consent to the removal in order to remove an action to federal court. *Balazik v. County of Dauphin,* 44 F.3d 209, 213 (3d Cir. 1995). However, this unanimity rule may be disregarded if a defendant has been fraudulently joined. *Id.* at 213 n. 4. Joinder is fraudulent "where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment." *Boyer,* 913 F.2d at 111 (quotations omitted). "The presence of a party fraudulently joined cannot defeat removal." *In re Diet Drugs,* 220 F.Supp.2d 414, 419 (E.D. Pa. 2002).

4

The Third Circuit Court of Appeals explicitly set forth the standards applicable to

fraudulent joinder analysis as follows:

> A district court must consider a number of settled precepts in ruling on a petition to
> remand a case to state court for lack of diversity jurisdiction.  When a non-diverse party
> has been joined as a defendant, then in the absence of a substantial federal question the
> removing defendant may avoid remand only by demonstrating that the non-diverse party
> was fraudulently joined.  But the removing party carries a heavy burden of persuasion in
> making this showing.  It is logical that it should have this burden, for removal statutes are
> to be strictly construed in favor of remand.
>
> Joinder is fraudulent where there is no reasonable basis in fact or colorable ground
> supporting the claim against the joined defendant, or no real intention in good faith to
> prosecute the action against the defendants or seek a joint judgment.  But, if there is even
> a possibility that a state court would find that the complaint states a cause of action
> against any one of the resident defendants, the federal court must find that joinder was
> proper and remand the case to state court....
>
> In evaluating the alleged fraud, the district court must focus on the plaintiff's complaint at
> the time the petition for removal was filed.  In so ruling, the district court must assume as
> true all factual allegations of the complaint.  It also must resolve any uncertainties as to
> the current state of controlling substantive law in favor of the plaintiff.

*Batoff v. State Farm Insurance Co.,* 977 F.2d 848, 851–52 (3d Cir. 1992) (citations and

punctuation omitted).  *See also In re Briscoe,* 448 F.3d 201, 217 (3d Cir. 2006).

DISCUSSION

A.     **McNEIL's Principal Place of Business**

Under the forum defendant rule, a civil action that is "otherwise removable solely on the

basis of [diversity jurisdiction] may not be removed if any of the parties in interest properly

joined and served as defendants is a citizen of the State in which such action is brought."  28

U.S.C. § 1441(b).  Mr. Arndt claims that McNEIL has its principal place of business in Fort

Washington, Pennsylvania, and that therefore, the Defendants violated the forum defendant rule

in removing.  The Defendants, however, contend that McNEIL has its principal place of business

in Skillman, New Jersey.  This disagreement over the principal place of business of McNEIL

turns on how the "nerve center" test, adopted by the Supreme Court in *Hertz v. Friend*, 559 U.S. 77 (2010), and discussed in more detail below, applies to the particular facts of this case. Defendants argue that employees of Johnson & Johnson entities other than McNEIL carry out the actual direction, control, and coordination of McNEIL in Skillman, New Jersey.  Mr. Arndt argues that the Court must look only to the high ranking officers of McNEIL itself to determine where McNEIL's principal place of business lies.  Thus, Mr. Arndt contends those officers operate primarily in Fort Washington, Pennsylvania.

The facts relating to the issue, drawn from the parties' submissions and the record in *Moore*, are as follows.  McNEIL-PPC is a wholly owned subsidiary of Johnson & Johnson.  It has four principal officers, including a president and vice president based in Fort Washington. According to McNEIL's bylaws, the president and vice president have the authority to direct the affairs of the business.  In practice, however, those officers only oversee a division of McNEIL (the Consumer Healthcare Division), and have no involvement in the production, marketing, or sale of McNEIL's other products.  Instead, a group of executives from multiple Johnson & Johnson subsidiaries direct the overall management of McNEIL.  That group, known as the Family of Consumer Companies (FCC), is not a legal entity, but simply an operating group responsible for all of the consumer businesses under the Johnson & Johnson umbrella.  It has various regional units, including FCC-North America, which includes McNEIL.

Heading FCC-North America is Roberto Marques, who, with four other executives, sets business goals for the consumer companies under their auspices.  All five of these executives are based in Skillman, New Jersey.  The president of McNEIL reports directly to Mr. Marques. FCC-North America is the only entity that exercises oversight for all of McNEIL's business

units.  Below this level of the operating structure of Johnson & Johnson's various companies the business units that make up McNEIL are overseen by different groups of executives.

Neither the U.S. Supreme Court nor the Third Circuit Court of Appeals has squarely addressed whether activities of non-employees may be considered in determining where the principal place of business of a corporation is located, at least not since the Supreme Court handed down its decision in *Hertz*, 559 U.S. 77.  In *Hertz*, the Supreme Court adopted the "nerve center" test to determine a corporation's principal place of business, holding that a corporation's principal place of business is "where a corporation's officers direct, control, and coordinate the corporation's activities."  *Id.* at 92-93.  In setting forth this test, the Court stressed the need for "administrative simplicity" in deciding jurisdictional issues, contrasting the "nerve center" approach with other tests employed by various circuits that examined the location of the "general business activities" of a corporation.  *Id.* at 94-95.  Nonetheless, the Court recognized that even this relatively simple test would fail to eliminate hard cases and could lead to counterintuitive results, putting forth a hypothetical in which a corporation's public activities take place in New Jersey but its top officers direct those activities from New York.  *Id.* at 95-96.  The Court was not presented with the issue of whether the activities of individuals other than officers of a particular corporation may decide where a corporation's principal place of business is located.

Following *Hertz*, the Third Circuit Court of Appeals decided *Johnson v. SmithKline Beecham*, 724 F.3d 337 (2013).  In that case, the court held that the activities of a limited liability company whose sole member is a holding company were irrelevant to determining the principal place of business of the holding company, even though that holding company's principal place of business would necessarily determine the citizenship of the limited liability company.  *Id.* at 349-51.  Ultimately, the Third Circuit Court of Appeals in *Johnson* held that the location at which the

7

directors made decisions directing the holding company's activities – Wilmington, Delaware –

was the company's principal place of business, despite evidence that corporate officers carried

out tasks on behalf of the company in London and in Philadelphia, and despite evidence

concerning the location of the activities of the limited liability company itself.  *Id.* at 353-56.

     Two recent decisions in this district directly address the issue of McNEIL's principal

place of business and the impact of *Johnson* and *Hertz* on that issue: *Moore* and *Sherfey*.  In

*Moore,* the court found that the operating group in Skillman, New Jersey comprised of

employees of multiple Johnson & Johnson subsidiaries made the high-level decisions for

McNEIL, and that McNEIL's high-level officers, although they technically possessed the

authority under corporate by-laws to direct the corporation's activities, had delegated the actual

control of the company to the operating group.  *Moore II*, 2013 WL 5298573, at *7.   The court

relied in part on a pre-*Hertz* decision, *Mennen Co. v. Atlantic Mutual Ins. Co.*, 147 F.3d 287 (3d

Cir. 1998), in which the Third Circuit Court of Appeals, employing the "center of corporate

activities" test (the Third Circuit's pre-*Hertz* test for determining a corporation's principal place

of business), held that a court may look to the activities of non-employees to determine a

corporation's principal place of business if those non-employees are carrying out the day-to-day

activities of the corporation.[4]  *Moore II*, 2013 WL 5298573, at *5.  In *Sherfey*, the court adopted

Judge McLaughlin's reasoning in *Moore* and also concluded that McNEIL is located in New

Jersey.  *Sherfey*, 2014 U.S. Dist. LEXIS 10690, at *11-16.

---

[4]     In *Mennen*, the defendant had no employees in the United States, but rather delegated all of its activities to employees of a sister corporation, the bulk of whose employees were based in New Jersey. *Mennen*, 147 F.3d at 289-90.  The Third Circuit Court of Appeals concluded that the company whose name appeared on those employees' paychecks was irrelevant; what mattered were the actual functions the employees performed.  *Id.* at 291-92.  Although the *Mennen* court employed a test that was later rejected in *Hertz*, it specifically noted that the result would be the same if it looked to the "nerve center" test – the very test later adopted by the Supreme Court in *Hertz* – because not only were the day-to-day activities of the company centered in New Jersey, but the senior executives making overarching policy decisions were headquartered there also.  *Id.* at 293 n.6.

Mr. Arndt argues here that *Moore* was wrongly decided because the Supreme Court in *Hertz* emphasized a simpler, more formalistic approach, because *Mennen* is no longer good law, given that it employed a test that was later rejected by the Supreme Court, and because *Hertz* specifically directed courts to look to "where a *corporation's officers* direct, control, and coordinate the corporation's activities."  *Hertz*, 559 U.S. at 92-93 (emphasis added).  Mr. Arndt notes that the highest ranking officers of McNEIL – the officers designated in the bylaws as having ultimate authority for the company – are based in Fort Washington.  He also argues that in other cases, Johnson & Johnson has represented that its subsidiaries maintain control of their respective daily operations.

Defendants counter that, as the district court recognized in *Moore II*, the Third Circuit Court of Appeals has already rejected the notion that only the high-ranking *officers* of a corporation determine that company's principal place of business when it looked to the location of a company's directors in *Johnson*.  They further argue that the key inquiry is not the location of specific people, but the location of specific functions – the actual center of direction, control, and coordination of a company's activities.  Finally, they note that although representations that appear to conflict with the facts as found in *Moore* have been made in other cases (namely, that Johnson & Johnson subsidiaries independently manage their own affairs), the real state of affairs reveals otherwise, and there is a difference between the type of day-to-day decision making generically discussed in those cases and the type of overarching policymaking decisions relevant to the "nerve center" approach that dictated the result in *Moore*.

Application of the "nerve center" test to the facts of this case leads this Court to embrace the *Moore* analysis and result.  The key inquiry in determining the "nerve center" is the location of the "direct[ion], control, and coordinat[ion] of the corporation's activities," even when this

"simple" approach produces a counterintuitive result. *Hertz*, 559 U.S. at 92-96. Although some McNEIL officers are located in Fort Washington, these officers do not, in fact, direct, control, or coordinate McNEIL's business as a whole. However, individuals in Skillman, New Jersey do. Thus, like the district court in *Sherfey*, this Court adopts the reasoning in *Moore* and holds that McNEIL's principal place of business is Skillman, New Jersey. Therefore, the McNEIL status as a Defendant does not prevent removal.

### B.   Fraudulent Joinder of Individual Defendants

Mr. Arndt contends that he has asserted viable claims against the various individual defendants who are Pennsylvania citizens. Once again, under the forum defendant rule, a civil action that is "otherwise removable solely on the basis of [diversity jurisdiction] may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b). Thus, unless the individual defendants who are Pennsylvania citizens are fraudulently joined, this case was not properly removed and must be remanded.

In *Moore*, the plaintiff asserted claims against a few of the same individual defendants named here, to wit, Mr. Weldon and Ms. Crane, and Judge McLaughlin held that they had been fraudulently joined. *See Moore I*, 907 F. Supp. 2d at 663-64. Likewise, in *Sherfey*, the plaintiff asserted claims against the same individual defendants named in this case, making almost identical allegations, and Judge Kelly held that those individual defendants had been fraudulently joined. *See Sherfey*, 2014 U.S. Dist. LEXIS 10690, at*16-34.

This issue turns on whether Mr. Arndt has alleged successfully that the individual defendants actually participated in tortious conduct – *i.e.*, whether the allegations reflect misfeasance, as opposed to mere nonfeasance. This is so because under Pennsylvania law,

corporate officers may be personally liable if they "specifically direct the particular act to be done or participate, or cooperate therein," *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983), but "the mere averment that a corporate officer should have known the consequences of the liability-creating corporate act is . . . insufficient to impose liability." *Id.* The specific allegations against the individual defendants include the claim that they substantially reduced resources for quality control, failed to address quality control warnings from the FDA, dismantled corporate compliance groups, planned and implemented a secret recall of various medications, concealed dangers from the public, and continued to ship products despite knowledge of their defects.[5]

For the most part, the allegations here conjure up classic nonfeasance – i.e., they involve alleged failures to act. The allegations against Mr. Weldon and Ms. Crane in this suit are largely similar to those in *Moore*. The *Moore* court rejected these allegations as inadequate – "[a]t most . . . establish[ing] that Weldon set corporate priorities that he 'should have known' would cause injury to members of the public." *Moore I*, 907 F. Supp. 2d at 663. Despite an attempt to set forth more fulsome allegations against a much larger number of individual defendants in this case as compared with *Moore*, nowhere does the Complaint contain allegations suggesting that any of the individual defendants were directly involved in the manufacture or distribution of Infant's Tylenol. As the *Sherfey* court noted when faced with nearly identical allegations, "[a]t best, Plaintiffs allege that Defendants had notice or general knowledge of defects in the products,

---

[5] Plaintiff cites two cases that suggest that general allegations such as these may be enough to survive a fraudulent joinder analysis. *See Swanson v. McNeil-PPC*, No. 96-0375, 1996 WL 182806 (E.D. Pa. Apr. 17, 1996); *Pearson v. McNeil-PPC*, No. 96-446, 1996 WL 208456 (E.D. Pa. Apr. 17, 1996). As noted in *Sherfey*, neither of these cases meaningfully addressed Pennsylvania's participation theory, and neither has ever been cited by any court to support individual liability of a corporate officer or executive. *See Sherfey*, Docket No. 52, at 18-19. For the same reasons set forth in *Sherfey*, this Court declines to follow *Swanson* and *Pearson*'s approach of sidestepping the relevant legal issues. Instead, the Court will apply Pennsylvania's participation theory to the facts alleged in the Complaint in order to determine whether the individual defendants were fraudulently joined.

but failed to act in a way that would have prevented those specific products that allegedly harmed Plaintiffs from being sold." *Sherfey*, 2014 U.S. Dist. LEXIS 10690, at *33.

The primary allegations of arguably "active" conduct are allegations of phantom recalls of Infant's Tylenol, including allegations that various officers implemented, ordered, and oversaw phantom recalls of Infant's Tylenol, and allegations that Mr. Weldon and others made misstatements after Mr. Arndt's son ingested Infant's Tylenol.  As discussed in both *Moore* and *Sherfey*, the misstatements allegedly concealing bad conduct that were made after the tragic death of Mr. Arndt's son could not have caused his death and, though likely callous, are not actionable.  Assuming that Plaintiff has adequately alleged a phantom recall of Infant's Tylenol, like the statements made after the death of Mr. Arndt's son, this after-the-fact "active" conduct is not causally connected to Mr. Arndt's injury.  While a phantom recall may reflect an intent to conceal things from the public, the actual act of removing products from shelves via a phantom recall would make it less likely, not more likely, for an injury related to allegedly defective medication to occur, in that the offending product would be less readily available.[6]  And although implementing a phantom recall would not alert the public to the dangers of a defective product, neither would it serve to conceal those defects from the public in such a way that could cause injury.

---

[6]     Whatever the cause of action at issue, the result is the same – the offending conduct must be causally related to the injury suffered, in this case, the death of Mr. Arndt's son, to state a claim.  *See, e.g., Schemberg v. Smicherko*, No. 2153 MDA 2012, 2014 WL 545443, at *2 (Pa. Super. Feb. 11, 2014) ("Generally, to prevail in a negligence case, a plaintiff must demonstrate the following elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) *a causal relationship between the breach and the resulting injury suffered by the plaintiff*; and (4) actual loss suffered by the plaintiff....") (internal quotation omitted; emphasis added); *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) ("To make out a prima facie case under Section 349 of [New York's Consumer Protection Law], a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) *the plaintiff has been injured as a result*.") (emphasis added).

Because Plaintiff has not alleged any conduct on the part of the individual defendants that is causally connected to his injury and amounts to misfeasance, as opposed to nonfeasance, the individual defendants were fraudulently joined, the claims against them will be dismissed,[7] and they present no impediment to diversity jurisdiction.[8]

### C.   Fraudulent Joinder of Tops Defendants

Because the Tops Defendants, New York citizens, are not diverse from Mr. Arndt, they would have to have been fraudulently joined for the Court to maintain jurisdiction.[9] Mr. Arndt asserts a wide variety of claims against the Tops Defendants, including strict liability, negligence, recklessness, negligent infliction of emotional distress, and violations of New York's Consumer Protection Law.

Defendants argue that all of Plaintiff's claims against the Tops Defendants are barred by a two-year statute of limitations.  Under Pennsylvania's borrowing statute, 42 Pa. C.S. § 5521(b), "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim."  Pennsylvania allows two years for personal injury or wrongful death claims, 42 Pa. C.S. § 5524(2), while New York allows two for

---

[7]      Indeed, the claims against the individual defendants who are not Pennsylvania residents fail for the same reasons, and, as the district court in *Sherfey* held, must also be dismissed.  *See Sherfey*, 2014 U.S. Dist. LEXIS 10690, at *33-34.

[8]      In the most recent round of supplemental briefing, Defendants argue that the statute of limitations bars all of the claims against the Individual Defendants.  Because the Court finds that Mr. Arndt has not stated a claim against the Individual Defendants, it need not address the statute of limitations issue as it relates to the Individual Defendants.

[9]      Mr. Arndt argues that Defendants' Notice of Removal was deficient, in that the Tops Defendants did not consent to removal.  As noted above, the need for unanimity among defendants in deciding to remove may be disregarded if a defendant has been fraudulently joined. *Balazik,* 44 F.3d at 213 n. 4. Because this Court finds that the Tops Defendants were fraudulently joined, their consent to removal was unnecessary.

wrongful death and three for personal injury, McKinney's EPTL § 5-4.1; McKinney's CPLR § 214.  Thus, Defendants assert that the statute of limitations that applies to all of Mr. Arndt's claims is two years in length.

Mr. Arndt does not contest that the two-year statute of limitations applies to all of his claims, except for his New York Consumer Protection Law claim, as will be discussed below.  As to all other claims against the Tops Defendants to which a two-year statute of limitations applies, Mr. Arndt argues that the discovery rule and/or the doctrine of fraudulent concealment toll the statute of limitations.  "The 'discovery rule' is such an exception, and arises from the *inability* of the injured, *despite the exercise of due diligence,* to know of the injury or its cause." *Pocono Intern. Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983) (emphasis in original).  It is clear that in cases of wrongful death, the statute of limitations begins to run at the time of death, *i.e.*, at the time the plaintiff learns of the injury and is thereby put on inquiry notice to investigate its cause.  *See Pastierik v. Duquesne Light Co.*, 526 A.2d 323, 326-27 (Pa. 1987); *Stroud v. Abington Memorial Hosp.*, Civil Action No. 06-4840, 2008 WL 2061408, at *10 (E.D. Pa. May 13, 2008) ("[I]t is blackletter law in Pennsylvania that the discovery rule does *not* apply to wrongful death or survival actions.") (internal quotation omitted; emphasis in original).  Mr. Arndt provides no case law contradicting this basic principle of law, and, logically, that principle applies squarely to the facts here.  Mr. Arndt's son took a dose of Infant's Tylenol for a slight fever, immediately fell gravely ill, and died within a matter of hours.  Given these circumstances, Mr. Arndt was clearly on inquiry notice at the time of his son's death.

"Pennsylvania's doctrine of fraudulent concealment is based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into

the facts. . . In general, this requires that a defendant have done something amounting to an affirmative inducement to plaintiff to delay bringing the action." *Hoppe v. SmithKline Beecham Corp.*, 437 F. Supp. 2d 331, 336 (E.D. Pa. 2006) (internal quotations and citation omitted). Mr. Arndt contends that he has alleged numerous acts of concealment by various Defendants sufficient to toll the statute of limitations.  Whether or not these allegations are legally sufficient to toll the statute of limitations under the fraudulent concealment doctrine, there is no dispute that none of the allegations of fraudulent concealment involve the Tops Defendants.

Mr. Arndt cites case law stating that under New York strict liability laws, retailers may be held liable for the defective products of manufacturers whose products they sell, and he argues that this reasoning also must support the imputation of the other Defendants' acts of fraudulent concealment to the Tops Defendants.  *See, e.g., Suklijan v. Ross & Son Co.*, 503 N.E.2d 1358 (N.Y. 1986) (holding that a retailer may be held liable under a strict liability theory for injuries from defective products sold by that retailer).  This case law, however, does no more than provide a rationale for holding a retailer liable for timely strict liability claims involving a manufacturer's defective products.  Mr. Arndt has not cited any case extending this reasoning to holding a retailer liable for acts of fraudulent concealment on the part of the manufacturer so as to toll the running of the limitations period.  Indeed, while there may be policy reasons supporting the application of strict liability laws (*i.e.*, laws that by their very nature require no fault) to retailers, strict liability claims are an *exception* to the general rule that liability follows fault.  The general principle that a defendant is not responsible for actions in which that defendant did not participate, exert control, or conspire to commit certainly holds true when applying the equitable doctrine of fraudulent concealment:  "[a]s a principle based upon estoppel, [to prove fraudulent concealment] the plaintiff must show that the alleged fraud or concealment

is chargeable against each defendant whom the plaintiff argues should be estopped from asserting the statute of limitations."  *Stroud*, 2008 WL 2061408, at \*12; *see also Riddle v. Bank of America Corp.*, Civil Action No. 12-1740, 2013 WL 6061363, at \*8 (E.D. Pa. Nov. 18, 2013) ("[I]f [plaintiffs] seek to toll the statute of limitations against a particular Defendant, they must put forward an affirmative act of concealment by that Defendant.").  Whether or not Mr. Arndt stated a claim against the Tops Defendants, it is clear from the face of the Complaint that there are no grounds to toll the statute of limitations as to those Defendants.[10]

As to the New York Consumer Protection law claim, the statute of limitations for such a claim under New York law is three years.  *See Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 208 (N.Y. 2001).  The statute of limitations for a consumer protection law violation under Pennsylvania law is six years.  *See* 42 Pa. Cons. Stat. § 5525(8).  However, Defendants argue that the Pennsylvania counterpart to New York's Consumer Protection Law does not allow

---

[10]    The same is true under New York's fraudulent concealment doctrine:  "The doctrine of fraudulent concealment tolls the running of the statute of limitations only as to the defendants who committed the concealment."  *Bingham v. Zolt*, 683 F.Supp. 965, 975 (S.D.N.Y. 1988).  Thus, whether Pennsylvania's personal injury/wrongful death two-year statute of limitations applies or New York's wrongful death two-year statute of limitations applies, the result is the same.  Plaintiff's counsel suggested at oral argument that the discovery rule under New York law operates differently from its Pennsylvania counterpart, but nowhere in his briefing does he cite to any New York case law that would explain how New York's discovery rule would save his claims – all of the law cited with respect to the discovery rule and fraudulent concealment in his briefs is Pennsylvania law.

The only exception is that, in a footnote in his latest supplemental briefing, Mr. Arndt claims that New York's discovery rule would be applied consistently with his proposed application of Pennsylvania's fraudulent concealment doctrine, but aside from citing a case and a statute, he does not support this cursory statement with any argument, and the Court cannot envision one.  Indeed, the additional tolling provided by the statute to which he cites, NY CPLR 214-c, applies in conjunction with New York's three-year personal injury statute of limitations, which no one contends applies to this case, and requires a plaintiff attempting to take advantage of this additional statutory tolling to "allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would have been authorized," which Mr. Arndt clearly has not done.  *See* NY CPLR § 214-c(4).

recovery for personal injury claims.  *See Crumm v. K. Murphy & Co. Inc.*, No. CI-05-02780, 2009 WL 6057715 (Pa. Com. Pl. Sept. 16, 2009) (refusing to allow recovery for personal injuries under the Pennsylvania UTPCPL, noting that the law allows damages only for "any ascertainable loss of money or property, real or personal").  Defendants claim that this means that, for purposes of Pennsylvania's borrowing statute, the relevant Pennsylvania comparator to a New York Consumer Protection Law claim is not a Pennsylvania UTPCPL claim, but a negligence claim, which, as the Court has already discussed, is subject to a two-year statute of limitations.

Whether or not the New York Consumer Protection Law claim against the Tops Defendants is barred by the statute of limitations, Mr. Arndt has not successfully stated a claim against the Tops Defendants under the New York Consumer Protection Law.  Indeed, Mr. Arndt alleges no deceptive or misleading conduct on the part of the Tops Defendants that would support such a claim.  *See Maurizio*, 230 F.3d at 521 ("To make out a prima facie case under Section 349 of [New York's Consumer Protection Law], a plaintiff must demonstrate that (1) *the defendant's* deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result.") (emphasis added). [11]  As all of the claims against the Tops Defendants are either time-barred or clearly lacking in merit, these Defendants were fraudulently joined and cannot be used to defeat diversity jurisdiction.

---

[11]   Although counsel for Plaintiff conceded at oral argument that the only viable claims against the Tops Defendants were the strict liability claims, *see* 12/20/13 Tr. at 8:17-9:11, Plaintiff continued to press claims other than strict liability in his supplemental briefing filed after oral argument.  Thus, the Court addresses the New York Consumer Protection Law claim against those Defendants, despite Plaintiff's counsel admission that all of the claims against the Tops Defendants other than those for strict liability lack merit.

**CONCLUSION**

For the foregoing reasons, Mr. Arndt's motion to remand will be denied, and all claims against the individual defendants and the Tops Defendants will be dismissed.  An appropriate Order follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge